Matthew M. Levy, J.
The plaintiff sues to recover the sum of $30,731.68, for commissions allegedly due the plaintiff’s *25 assignor, Julio Eoea Vianna, in connection with the delivery of an aggregate of 8,000 automobile and truck tires and 1,646 tubes by the defendant to Danilo Nunez in Porto Alegre, Brazil. The cause came on for trial before the court without a jury. Findings of fact and conclusions of law were duly waived by the parties (Civ. Prac. Act, § 440). This opinion will constitute my formal decision. Before I proceed with a review of the evidence, and my conclusions thereon, I think that an analysis of the pleadings will be helpful to an understanding of the ramifications involved in the issues presented, the proof submitted, and the determination reached.
Paragraph Third of the amended complaint alleges that “ in or about the month of September, 1951, said Vianna entered into an agreement with the defendant whereby the defendant promised to pay said Vianna. a five percent (5%) commission for services performed as a commission agent on all business whatsoever transacted by the defendant with one Danilo Nunez”. In paragraph Third of the plaintiff’s bill of particulars, he alleges that “ the agreement referred to in paragraph Third of the Complaint herein was in writing. A copy thereof is annexed hereto as Exhibit B.” It is a letter from the defendant signed by its export manager, one Kaufman, addressed to Vianna, dated September 12, 1951, and reads as follows:
“ In connection with your discussion with our representative Mr. Donald Leitman, this is to confirm that in the event we should transact any business whatsoever with Mr. Danilo Nunez, we will protect you for a commission of 5% on all such business. ’
“We have been led to understand that you are now negotiating with Mr. Nunez for the sale of approximately 2,000 to 4,000 tires and tubes.
‘ ‘ In the future, you may accept Mr. Donald Leitmans word as our firms final decision in any dealings you may have with him.
‘ ‘ Trusting this will lead to a pleasant and profitable relationship.”
•In his bill of particulars, the plaintiff also annexes another writing. It is on the letterhead of Merchandise Trading Corp., Panama City, Panama, dated November 15, 1951, addressed to Vianna and signed by Don Leitman on behalf of the defendant, which the plaintiff alleges in his bill of particulars to be confirmatory of the agreement sued upon. That letter, marked in the plaintiff’s bill as Exhibit “ C ”, reads as follows:
*26 “ This is to confirm our agreement, re. all orders on tires that have been given or will be given us in the future by Mr. Danilo Nunez.
“ We will pay to you a 12.5% (twelve and a half percent) commission, in american currency, or the total G&I amounts of the invoices issued to Danilo Nunez, for all orders he may have sent.— or will send in the future.
‘ ‘ That commission will be paid to you immediately after we get from the Bank, notice that the actual dollar cover has been approved and payment in dollars made to us in N. York, for the corresponding invoices and sight-drafts. We understand that your said commission of 12.5% is to be paid by us in dollars in N. York, to Heidi’s Inc., 44 Whitehall Street, for the credit of your deposit account with them.—■ ’ ’
At the conclusion of the trial, the plaintiff moved to amend his complaint further by “ conforming his pleadings to the proof ” so as to add a cause of action on “an oral agreement supported by sufficient memoranda to satisfy the statute of frauds ”, and a further cause of action in quantum meruit if the court ‘ ‘ should not find an express agreement between plaintiff’s assignor and the defendant ”. Decision on this motion was reserved.
Now, let me outline the defendant’s answer. In addition to the denials of the material allegations of the amended complaint, the defendant in its amended answer alleges that Vianna rendered no services to the defendant “as a commission agent or otherwise that Nunez “failed and refused to pay for the said tires and tubes immediately upon their delivery that Vianna “failed and refused [as he had agreed] to make payment for said tires and tubes immediately upon their delivery * * * or to cause such payment to be made by the said Danilo Nunez and that Vianna “ failed and refused [as he had also agreed] to pay interest at six (6) percent per annum on the purchase price of said tires and tubes for delays in making payments thereof to the defendant after delivery of said tires and tubes
The defendant further pleaded three affirmative defenses, which were originally interposed as counterclaims, as well as setoffs, but, at the close of the trial, they were dismissed as counterclaims with the defendant’s consent. Such three affirmative defenses and setoffs were to the effect that (1) Vianna had “ guaranteed to defendant that sight drafts for the purchase price of said tires and tubes would be taken up and paid immediately upon the arrival of said tires and tubes ”, and that Vianna failed to pay said sight drafts issued to Nunez *27 by the defendant in accordance with this claimed guaranty; (2) that Vianna had “ agreed to pay defendant interest at the rate of six (6%) percent per annum for delays in defendant receiving payment in dollars for the purchase price of said tires and tubes which should exceed sixty (60) days from the date of presentation * * * of sight drafts for the payment of such purchase price ’ ’, and that Vianna failed to pay interest on said delayed payments in accordance with this claimed agreement; and (3) that Vianna had “ represented to defendant that tires and tubes were scarce * * * and greatly in demand, that tires and tubes were selling at high prices * * * and that all drafts for the purchase price of said tires and tubes would be duly honored upon presentation”, but that “said representations made by [Vianna] were false, and were known to be false ’
At the opening of the trial the defendant was permitted to add three additional affirmative defenses. These are to the effect that the claimed agreement to pay commissions to the plaintiff’s assignor (a) is barred by the Statute of Frauds; (b) was illegal under the laws of Brazil in that it provided for payment in American currency; and (c) was part of an illegal “ overage ” agreement which is also unenforcible under the law in Brazil. These three additional affirmative defenses were consented to by the plaintiff upon a stipulation entered upon the trial record to the following effect:
1 ‘ If the Court should find that the contract sued on was in writing and was the defendant’s letter of September 12, 1951, the defendant stipulates to waive the defenses of illegality under Brazilian law.
16 If the Court should find that the letter of September 12, 1951, is not the contract between the parties, then such defenses are in issue. ’ ’
I shall now note the plaintiff’s reply. In that pleading, the plaintiff admits in effect that his assignor, Vianna, did not immediately pay or cause to be paid the sight drafts on the shipments referred to in the defendant’s first affirmative defense and setoff. The plaintiff also admits that the payments by Nunez on the invoices for the shipment were made at times in excess of 60 days after presentation of the sight drafts, without the payment of interest (which is the burden of the defendant’s second affirmative defense and setoff)—it being the plaintiff’s position, as specified in his bill of particulars, that, by virtue of agreements entered into between Nunez and the defendant, Nunez was released from liability for the payment of interest on the late payments. Furthermore, the plain *28 tiff contends that the delays in the payment of sight drafts were caused by the defendant’s failure to ship the tires and tubes in accordance with the specifications included in the orders and the instructions issued to the defendant. It is the plaintiff’s position that the defendant did not obtain proper licenses and authorizations for exporting the tires and tubes; that the defendant did not ship them on the dates as promised; and that it did not ship the tires in the quantity, brand, size, type and prices ordered; and that the invoices and sight drafts were not prepared according to the instructions which were given' on Nunez’ behalf by Vianna, orally and in writing, to the defendant. According to the plaintiff, the delays from the time the goods arrived in Brazil to the time they were covered by sight drafts were due to the fact that Nunez’ customers refused to accept deliveries because they were late and they, the customers, cancelled the orders for future deliveries and refused to accept deliveries not in accordance with their orders; and Nunez, with Vianna’s help, was required to find new customers for the merchandise. Finally, in his reply, the plaintiff claims that the reason for any delay in the exchange of cruzeiros into American dollars, in payment for the equipment shipped to Nunez, was that there was a shortage in Brazil of American dollar deposits with which to pay creditors resident in the United States.
The first issue to be considered is whether or not the letter of September 12, 1951, was intended to be the contract between the parties, and the second, whether, if so, it was a valid and binding agreement, enforcible in accordance with its terms. The first poses a question of fact, upon which some conflicting testimony was presented; the second a question of law upon which briefs have been submitted.
The evidence disclosed the following: The defendant is a New York corporation, engaged in the business of the sale and distribution of automobile and truck tires and tubes, here and abroad. The plaintiff’s assignor, Vianna, and one Nunez are residents of Brazil. In August, 1951 Nunez held two valuable import licenses issued by the Brazilian government authorizing him to import into Brazil from America 2,000 tires and 2,000 tubes. Desiring to use these licenses to his financial advantage, Nunez asked his friend, Vianna, who was experienced in the import and export business, to obtain an American supplier. Vianna advertised accordingly. The defendant responded to Vianna’s advertisement, and, through its agent, Donald Leitman, contacted Vianna in Rio de Janeiro in September, 1951. Leitman conferred with Vianna on or about September 8, 1951 *29 •—-four days before the pivotal letter was written-—and a discussion at some length was had. The importation of tires and tubes from the United States into Brazil was the subject. At this conference the nature and amount of the commissions payable to Vianna were also discussed, and Leitman was informed by Vianna that Nunez was the party who had the licenses necessary to effectuate the importation of the material into Brazil from the United States. Agreement was reached as to Vianna’s compensation in the event that the defendant succeeded in doing business with Nunez. Pursuant to Vianna’s request, the defendant’s export manager sent the letter of September 12, 1951 to Vianna, incorporating in writing the agreement made between the parties.
From all- of the evidence before me, I find that an oral contract was entered into by Donald Leitman, on behalf of the defendant (and for whom he was duly authorized to act), and Vianna, by which the defendant promised to pay Vianna a 5% commission on the f. o. b. prices of all orders placed by Nunez and for which the defendant received dollar payment, in exchange for Vianna’s performing certain acts: introducing the defendant to Nunez; serving as interpreter; aiding the defendant in all business transactions with Nunez; using his friendship with Nunez to persuade Nunez to accept the defendant as his supplier of tires and tubes. And, at Vianna’s request, a memorandum confirming this agreement was made by the defendant in the form of the September 12, 1951 letter. This communication is on the stationery of the defendant, signed by an authorized representative of the defendant, “H. E. Kaufman, Export Manager ”. The writing refers to “ discussion with our representative Mr. Donald Leitman ’ ’ and states that it is “ to confirm ” that in the event the defendant “ should transact any business whatsoever with ” Nunez, defendant “ will protect” Vianna “ for a commission of 5% on all such business ”.
The defendant’s assertion that the contract between the parties — if a contract was ever entered into—was the letter of the defendant to Vianna, dated November 15, 1951, is not convincing either from the point of view of the letter itself or from the evidence adduced at the trial. This November 15 letter, which refers to a commission of 12-%%, payable in American currency “ on the total C & I amounts ”, represents an agreement between the defendant, entered into through Leitman, and Nunez with respect to “ overage The evidence clearly points up the fact that the only commission that Vianna ever referred to either orally or in his various communications as his compensation was a 5% commission. During the course *30 of the trial, defendant itself offered in evidence correspondence in which Vianna referred to his 5% commission, and there was no documentary proof submitted by the defendant denying or contradicting this statement. Other percentages were mentioned in other communications, but they always included ‘1 overage ’ ’, in addition to the commissions. For example, in the defendant’s cable of March 16, 1952 (which was addressed to Nunez and not to Vianna and dealt with “ overage ”) the defendant said, among other things, that ‘ ‘ Prices are OIF include 13.4 percent commissions and all expenses.” (Italics supplied.) And, in a letter from Vianna to the defendant dated June 2, 1952, he stated, among other things, in the next to the last paragraph, the following: “ Please send me a statement of account of the overage, at 13.4% as per our agreement with Don [Leitman] in letter of November 15, 1951, also confirmed in your cable of March 15th addressed to Dañilo [Nunez]. From the total amount of overage (over-price to Dañilo and commission to me) should be deducted the amount you have paid for my 1952 Cadillac ’ ’.
The plaintiff’s motion to amend his complaint by adding a cause of action grounded upon an oral agreement is granted. In response, the defendant contends that the oral contract would be barred by the Statute of Frauds, as a contract not to be performed within one year from the making thereof, and that the letter is not a sufficient memorandum to lift the bar of the statute (Personal Property Law, § 31). The law in this State is unsettled as to whether the New York Statute of Frauds is applicable to an oral contract made in Brazil (Rubin v. Irving Trust Co., 305 N. Y. 288, 297). Under our law, it is clear that it is not the cause which is barred, but its maintenance, and that is a matter of defense (Zauderer v. Paterno Estates, 25 Misc 2d 180; Matthews v. Matthews, 154 N. Y. 288, 291-292). Since the defendant has the burden of proving this affirmative defense (Crane v. Powell, 139 N. Y. 379), and offers no comparable Brazilian statute, I shall assume without deciding that the contract would not be barred under Brazilian law (Mangrelli v. Italian Line, 208 Misc. 685, 688).
Anri so I pass to a consideration of the applicable New York law in the light of the relevant facts. The letter identifies the parties, and is signed by an authorized agent of the defendant, the party to be charged. Nunez did not undertake to pay any commission to Vianna — it was the defendant who wrote to Vianna about the 5% commission and a “ pleasant and profitable relationship ’.’ between them. The defendant’s letter agrees to “ protect ” Vianna for a commission of 5% on all *31 business transacted with Nunez. It is difficult for me to understand that “ protect ” in the present context could mean anything but “pay” or “guarantee”. (Cf. Wabash, St. Louis & Pac. Ry. Co. v. Ham, 114 U. S. 587, 596.) Certainly, Vianna was not here engaged in the performance of an act of mercy or charity on the defendant’s behalf. The transaction, was a business one and is to be so viewed.
The defendant urges that no consideration was stated in the letter of September 12,1951 for its promise to pay commissions. In Martocci v. Greater New York Brewery (301 N. Y. 57, motion for reargument or to amend remittitur denied 301 N. Y. 662) the Court of Appeals found consideration 1‘ by necessary implication, by inevitable construction ” so as to satisfy the Statute of Frauds (301 N. Y. 63). The letter in Martocci is so similar to the instant one, that it is set out in a footnote.* In that case the court, in effect, held that, with respect to the case at bar, Vianna would be entitled to a 5% commission on all business transacted between the defendant and Nunez since Vianna brought the parties together. The Court of Appeals said (p, 64): “ The whole transaction before us is instinct with the inference that plaintiff’s work was done when he, by reason of personal and/or business friendship and association, had induced Lorillard’s purchasing agent to take the syrup, thereby furnishing defendant with a new customer whom it sought. Had plaintiff been unsuccessful, he would have received nothing. His situation was no different from that of the ordinary brokerage transaction, where the broker is not bound to procure a customer, but is entitled to a commission when he succeeds.”
The defendant also points out that the letter of September 12, 1951 does not specify the basis on which the 5% commission was to be calculated. But. as I view it, the absence of a method of computation of the commission does not make the document vulnerable to attack as a nudum pactum, or as an inadequate written memorandum to satisfy the Statute of Frauds. Indeed, the memorandum would not be insufficient had it entirely *32 omitted the percentage of commission to be paid the plaintiff (Stulsaft v. Mercer Tube & Mfg. Co., 288 N. Y. 255). Upon the proof before me, it would seem clear that this compensation was to be computed on the f. o. b. price of the merchandise charged by the defendant to Nunez. That is the normal business arrangement, and there was no effort made by the defendant to prove any other agreement. On the contrary, the conduct of the parties after the receipt of the letter justifies the inference. The 5% commission could refer only to either the f. o. b. or c. i. f. figures of the shipping documents. Since a contract is always read in the light of all surrounding facts and circumstances known to both parties at the time of its making (Stulsaft v. Mercer Tube & Mfg. Co., 288 N. Y. 255, supra), and as the only reference to the c. i. f. term was in the later agreements which redefined Vianna’s commission for purposes of the overage, custom of the trade and the construction placed by the parties themselves upon the Vianna-defendant contract clearly indicate that the f. o. b. price was the one intended.
I recognize that, in the Martocci ease (supra), in finding the letter a sufficient memorandum to satisfy the Statute of Frauds, the court refers to a later acknowledgment by defendant of plaintiff’s acts. Here, too, there is ample evidence of confirmation in the defendant’s letter of November 15, 1951 to Vianna, and of acknowledgment in the defendant’s deposit of $864.42 to Vianna’s credit in New York on November 19,1952.
The subsequent case of Nat Nal Service Stations v. Wolf (304 N. Y. 332) is apposite to a disposition of the present issue, and I quote rather fully what the court said on this point (p. 339): “In the Martocci case the plaintiff’s performance constituted the introduction of the defendant to the customer, and in the Cohen case [Cohen v. Bartgis Bros. Co., 264 App. Div. 260, affd. 289 N. Y. 846] the plaintiff performed his part of the contract by having procured the customer for the defendant. In both those cases the performance by the respective plaintiffs under the alleged oral agreement constituted the consideration necessary to impose a binding obligation upon the defendants to carry out their part of the contracts, in accordance with their promises, by paying the plaintiffs commissions on all sales to the customers whenever made. * # * In neither the Martocci case nor the Cohen case could the defendant escape contractual obligation to the plaintiffs to pay commissions upon sales to the customer procured by the plaintiff. The plaintiffs’ right to commissions in those two cases was not dependent upon any act of the plaintiffs or the defendants, as here, but was wholly dependent upon the act of the third party, the procured *33 customer. Any time the customer placed an order which the defendants were in good faith bound to accept they had to pay the plaintiffs the commission called for.”
For Vianna to be entitled to commissions from the defendant it was necessary that Vianna introduce Nunez to the defendant and that the defendant have business dealings with Nunez. There is no question but that such an introduction did take place and that the business dealings between the defendant and Nunez were a direct consequence thereof. The testimony of both Vianna and Leitman was not only that Vianna had brought the defendant and Nunez together, but that Vianna actively took part in some of the meetings between Nunez and the defendant’s representative, especially those which dealt with prices and terms, as a result of which Leitman agreed with Nunez that Nunez would be one of the customers of the defendant. And, promptly after the receipt of the letter by Vianna, dated September 12, 1951, orders were placed by Nunez with the defendant for 565 tires and 211 tubes. These orders, placed in November, 1951 and March, 1952, were shipped in March, 1952, and sight drafts drawn on Nunez were fully paid in April, 1952 in cruzeiros.
Had I held that the contract between the parties was in writing, and was the defendant’s letter of September 12, 1951, then the defenses of illegality under Brazilian law, which the defendant added as affirmative defenses at the opening of the trial, would have been waived in accordance with the stipulation entered into in connection with these additional affirmative defenses. There would then be no need to go into the question of the sufficiency of these defenses. But, since I hold that the contract between the parties was the oral agreement, confirmed by the letter of September 12, 1951 — and not the letter itself — the defendant’s stipulation to waive the defenses of illegality under Brazilian law in the event the court found the letter to be the contract is not effective, and the defenses are in issue.
The defendant contends, and the plaintiff agrees, that the law of Brazil governs the question of legality. Since a contract is presumed to be valid and enforcible (Red Robin Stores v. Rose, 274 App. Div. 462, 466), the defendant has the burden of showing its illegality. The defendant’s claim in that regard is based on two separate agreements: first, the overpricing of Nunez’ invoices, and second, the agreement to pay Vianna’s commissions in dollars.
In support of the first basis, the defendant cites Brazilian Decree No. 23,258, dated October 19, 1933, which labels certain foreign exchange practices illegal, and points to article 3 which *34 imposes statutory penalties where the price of imported merchandise is increased for the purpose of obtaining unlawful overages. Article 3 does not label the activity as ‘ ‘ illegitimate ’ ’, as it does the other practices specified in the next preceding articles. I am not convinced that the overage, though subject to penalty, makes the whole contract illegal. To aid Nunez, it was agreed by the defendant and Nunez to overprice the drafts and thus avoid Brazilian currency regulations. This necessitated redefining Vianna’s commission in terms of the inflated price. Clearly, the fundamental subject of the agreement between Nunez and the defendant was the sale of tires and tubes, which was perfectly legitimate. If there was any illegality in the pricing of the invoices, it relates only to the dealings between Nunez and the defendant, and should not affect Vianna’s agreement with the defendant.
The defendant claims, in respect of the second basis for the assertion of illegality, that the payment of dollars to Vianna as a commission is illegal under Brazilian law, and cites a letter from an official of the Bank of Brazil. Assuming that such a document correctly states, and can be taken as proof of, the Brazilian law, it merely outlines the procedure used for the payment of commission to the agent in Brazil in cruzeiros. It in no way states what would occur if the agreement were to pay in dollars in the United States. The words of the letter are permissive, such as “ can be ” and “ ought to ”, and in no way indicate that such procedure is mandatory in all cases of Brazilian residents receiving commissions on foreign trade.
In short, I find that the defendant has failed, on either count, to sustain its burden of proof as to illegality so as to prevent Vianna from recovering on the contract.
I shall next seek to resolve the question of damages. It cannot be gainsaid, and I hold, that the plaintiff as assignee is entitled to the stipulated commission due Vianna of 5% on the f. o. b. prices of the 565 tires and 211 tubes ordered by Nunez in November, 1951 and March, 1952, shipped in March, and the sight drafts for which, drawn by the defendant on Nunez, were fully paid in April, 1952 and in June, 1952 in cruzeiros. Dollar coverage was effected on a 200-tire shipment thereof on December 29, 1953; on an 80-tire shipment thereof on April 21, 1954; and on a 285-tire shipment thereof and the 211-tube shipment on April 21,1954. The total amount of this dollar coverage is $52,744.89, and the 5% commission thereon amounts to $2,637.24.
The plaintiff, in addition, presents his assignor’s claim to a commission of 5% on the f. o. b. prices of the orders placed by *35 Nunez not only individually, but also as a party of certain joint ventures which Nunez and the defendant organized. In April, 1952, Nunez placed orders for a total of 1,435 tires and 1,435 tubes, which the defendant shipped through the World Commerce Corporation and which arrived in Brazil in May, 1952. Nunez, at the time, was unable to honor the sight drafts drawn upon him. The defendant and Nunez then agreed, in writings dated June 28, 1952, and July 2, 1952, to form a joint venture between them for the purpose of disposing of the 1,435 tires and 1,435 tubes. Pursuant to this contract of joint venture—which provided for an equal division of profits and in which Nunez was to supply the import license and the defendant was to be responsible for the financing—the sight drafts were paid in cruzeiros in July, 1952, and dollar exchange was effected on September 30, 1953. There was also another joint venture entered into at the same time and providing for similar participation and equal division between Nunez and the defendant. In respect thereof, Nunez had secured an additional import license for 6,000 tires, and 6,000 tires were ordered from the defendant by the joint venture. This order was shipped by the defendant through the G-eneral Tire and Rubber Company. The merchandise arrived in September, 1952. Sight drafts were again paid in cruzeiros, and dollar exchange was effected in June, 1954. While these shipments by way of the joint-venture arrangements were taking place, Vianna and the defendant were actively engaged in correspondence by mail and cable in regard to these transactions.
In the circumstances proved upon the trial—written and oral, factual and inferential—I find that Vianna is entitled to commissions on these later shipments. I do not overlook Leitman’s testimony, given in his examination before trial (which was read into evidence at the trial) wherein Leitman stated—in answer to a question as to whether the September 12, 1951 letter represented “ the arrangement you had with Vianna with respect to a commission of 5% ”—that ‘ ‘ Vianna requested authorization from me in acting as I represented myself as Merchandise Trading so upon his request I had our New York office send this letter giving him his request that I had authorization to act for the Tire Mart and confirming my understanding in respect to this particular deal. Q. With respect to the commission? A. With respect to the commission on this particular deal.” (Italics supplied.) But the September 12, 1951 letter refers to “ any business whatsoever ” which the defendant “ should transact ” with Nunez; it relates that Vianna is negotiating with Nunez for the sale of 2,000 to 4,000 tires *36 and tubes; and it contemplates a “ pleasant and profitable relationship It is, in my view, the necessary implication and inevitable construction of the oral agreement (as confirmed by the letter) that Yianna was to be paid a commission on any and all business that resulted, and not only on “ this [first] particular deal”, as Leitman testified on his examination before trial.
The testimony of both Yianna and Leitman further conclusively points up the credit to be accorded the plaintiff’s contention that the agreement leading up to the September 12,1951 confirmation contemplated that Yianna would receive a commission on all business transacted with Nunez and that the commission was not to be limited to the import licenses which Nunez then held. Not only does the September 12 letter itself refer to negotiations for “ approximately 2,000 to 4,000 tires and tubes ”, but Leitman was told that Nunez had made an application for an additional import license covering some 6,000 tires and this was reiterated in a letter which Yianna wrote to Leitman on September 20, 1951, in which letter he stated: “ The new license for 6,000 tires is almost approved.” And on January 12, 1952 Leitman cabled Yianna, among other tilings •—‘ ‘ Have Brazilian customers interested in procuring six thousand tires Nunez has license for stop Advise if interested in proposition of this type.”,
The plaintiff argues that, under the contract between Yianna and the defendant, Yianna is entitled to commissions on all the transactions because Nunez was a party to them all. The defendant argues that the joint venture was not Nunez, but an entirely different entity, and that Yianna is therefore not entitled to any commissions whatsoever. In my view, this matter cannot be disposed of on the basis of the narrow concept of the technical literalness of the situation as claimed by either party, but rather on the spirit and dynamics of the agreement between the parties and the transaction as founded on the facts. Nunez was an interested party in the joint venture, and were that not so the defendant could not have had the licenses necessary to import the merchandise. But unless the defendant, too, were an interested party in the joint venture, the needed financing would not have been available. From all of the evidence before me, I have no doubt that the September agreement contemplated and was recognized by the defendant as entitling Yianna to a commission, and that this commission was payable on all business the defendant obtained through Nunez. That, in the later instances, the merchandise was consigned to joint ventures in Brazil in which the defendant itself was a party did not result *37 in the defendant’s absolution from its obligation to pay commissions. Nunez was a party to such joint ventures as well, and shipments to the Nunez-defendant joint ventures — at least so far as the Nunez interest was concerned—came within the area of “ any business whatsoever with Mr. Dañilo Nunez” which the plaintiff’s assignor procured for the defendant and for which the defendant should pay. Yianna had not only introduced the principals but performed many other functions. He took an active part in the forming of the joint ventures, his signature appearing as a witness on the contracts. The defendant continued to correspond with Yianna in a manner which indicated that it considered Yianna an important part of its business dealings with Nunez. On the trial, letters and cables as well as oral testimony were introduced in evidence, all of which specifically and clearly showed that Yianna was in the midst of all matters concerning business transactions between Nunez and the defendant. And as late as November, 1952, at Yianna’s request, the sum of $864.42 was placed by the defendant to Yianna’s credit as an advance on commissi on a.
But, of course, Yianna is not entitled to be paid commissions on the merchandise the defendant sold to itself in Brazil. By that I mean that, while Nunez and the defendant were joint venturers, and Yianna is entitled to commissions on the Nunez share thereof, the defendant is not obligated to pay commissions on the merchandise consigned to its share of the joint ventures. I find, therefore, that Yianna is entitled to recover 5% commissions based on the f. o. b. prices of the merchandise consigned by the defendant to the Nunez end of the venture and not to the defendant’s end. Since the joint-venture agreements provided for fifty-fifty interests and profits as between Nunez and the defendant, I hold that Yianna’s commissions on the joint-venture transactions are to be based on one half of the shipments sent to the joint ventures. I compute Yianna’s commissions on these transactions to be the sum of $14,479.43, as follows: On 1,435 tubes, the 5% commission (if Nunez were the sole purchaser, and not as part of the joint venture with the defendant) amounted to $242.06, and on 1,435 tires such commission amounted to $4,227.91. This takes care of one joint-venture agreement. On the 6,000 tires the 5% commission amounted to $24,488.89. This takes care of the other joint-venture agreement. Thus, the commission on the two joint-venture agreements aggregated $28,958.86 and one half of this commission is $14,479.43.
I come now to another phase of the case. I have heretofore mentioned that, at the conclusion of the trial, the plaintiff *38 moved to conform the pleadings to the proof so as to add a cansé of action in quantum meruit, if the court ‘ ‘ should not find an express agreement between plaintiff’s assignor and the defendant.” Decision on this motion was reserved, and in view of my- holding that there was an express agreement between the parties and that that express agreement was confirmed by the letter of September 12, 1951, the motion now is denied as •academic. However, I feel it would not be amiss to point out that, had I found that there was no express agreement between the parties, then the plaintiff’s motion to add a cause of action based on quantum meruit would have been granted by me. In this connection, the reasoning of the Court of Appeals in Smith v. Kirkpatrick (305 N. Y. 66, motion for reargument denied 305 N. Y. 926) is applicable. In that ease, the court said, at pages 73-74: “ Although stating different causes of action, the second complaint [pursuant to which plaintiff sought to enforce a right which arose out' of an express agreement] is not so inconsistent or irreconcilable with the complaint in the present action in quantum meruit [pursuant to which plaintiff’s alleged right rests upon an implied contract] that the choice of the former action precludes resort to the present one. Both complaints assumed basically that there existed between the plaintiff and defendant a contractual relationship, and that defendant had reaped benefits at plaintiff’s expense. In this State where a ■litigant fails to establish the right to recover upon an express contract he may, in the same action, recover in quantum meruit. [Citations.]' If warranted by the pleadings and proof, the case may" be • submitted to a jury on both theories and an election need not 'be made. [Citations.] In Walar v. Rechnitz (supra [126 App. Div. 424]), where it was indicated that a plaintiff should nbt be required to elect but should be allowed to attempt recovery, in the same action, on express contract or in quantum meruit, it was suggested (p. 426) that after an adverse judgment in an- action strictly limited to the theory of express contract a 'hew action in quantum meruit could yet be maintained. [Citation.] ' It is thus clear that there exists no such irreconcilable inconsistency between the claims asserted by plaintiff in the present and former actions that he may be held to have made an election.”
This judicial pronouncement is indeed appropriate to the factual situation in the case at bar. The testimony before me was replete with instances where Vianna performed numerous services for the defendant in connection with the business transacted between it and Nunez. The evidence, both oral and documentary, is convincing that these services were rendered *39 in many instances at the request of the defendant and in all instances were accepted by it. Accordingly, even if no express agreement were proved to have been entered into between the parties in this case, the plaintiff would have been entitled to recover on the basis of quantum meruit. And, in my view, the recovery would be on the basis of a 5% commission— the compensation which both parties here, by their writings and conversations, recognized as fair and reasonable in .the circumstances.
Now let us consider and analyze, in the light of the proof, the defendant’s various affirmative defenses and setoffs. The defendant’s position, in two of its defenses and setoffs, is that Vianna, in March of 1952, “ for the purpose of inducing defendant to make shipments of tires and tubes to ” Nunez, “ guaranteed to defendant that sight drafts for the purchase price of said tires and tubes would be taken up and paid immediately upon the arrival of said tires and tubes in ’ ’ Brazil. The defendant further alleges that, in reliance upon said guarantee, it made shipments to Nunez in Brazil, and Vianna failed to take up or pay the sight drafts covering the purchase price. In addition, the defendant claims that Vianna “ agreed to pay defendant interest at the rate of six (6%) percent per annum for delays in defendant receiving payment in dollars for the purchase price of said tires and tubes which should exceed sixty (60) days from the date of presentation at Porto Alegre, Brazil, of sight drafts for the payment of such purchase price that. the defendant relied upon such agreement, and that, although payment in dollars was made in excess of 60 days after presentation of sight drafts, Vianna failed to pay interest thereon. The defendant sets up these contentions not only as affirmative defenses but also as setoffs.
Considering, first, the affirmative defense and setoff of the claimed guaranty by Vianna to pay the sight drafts, I find that the guaranty has been established at the trial by the documentary evidence offered in support thereof, notwithstanding some confusion in Leitman’s trial testimony on the issue. In a cable dated March 8, 1952 from Vianna to the defendant, he stated, among other things, “ Don’t worry I guaranty personally payment all drafts against any deposits not extended Stop Sass working closely with me.” (Sass is a representative of the defendant.)
In a letter dated June 2, 1952 from Vianna to the defendant, he wrote, among other things, “ Now, check your files, and you will find my cable of March 7th, in which I said: ‘ Don’t worry, I guaranty personally payment all drafts against deposits not ' *40 extended ’. Therefore, I decided to pay the said draft re. invoice MT 137, and it is already paid, and now Danilo [Nunez] is selling the tires to a few separate customers.”
And some 12 days later—on June 14—Vianna wrote to the defendant stating, among other things:
“ In my letter of June 2nd. I advised you of having paid your draft re. invoice MT 137, for $8656,40, because said payment was to be made that same day.— But it happened immediately that I got news that a payment which was owed me by a local government agency was about to be made me, and I decided that said amount would be enough to pay one of your larger drafts, and thus I withheld temporarily payment of your invoice MT 137, in order to be able to pay one of the larger ones, for nearly $31,000,00 dollars.—
“1 am now glad to inform you that Tuesday next, June 17th, I will pay myself in cruzeiros your invoice MT 2007, for the $30,851,60. and by the end of next week you will have received notice from your Bank in N. York of said payment having been made.—Even though most of my working capital is usually tied in my own business, I could leave aside now enough to meet said payment, because most of the tires are practically sold, and in about 10 or 15 days, I shall be reimbursed again of my money, and then be able to pay your invoice MT 137.— ”
# * *
“ I think, therefore, that in this way we have found a solution,— even though we had never expected primarily and originally, to have to invest capital of our own into this deal,— as we expected to act only as a representative on a commission basis.— ”
Leitman testified, in his examination before trial on July 24, 1956, which was read into evidence at the trial, that Vianna made a guaranty of payment of the sight drafts on the tires and tubes shipped to Nunez, although that guaranty was not made to him, Leitman, but was solicited through Sass and that he, Leitman, personally did not partake in any of the negotiations leading up to this claimed guaranty because he at the time was in California. At the trial itself, however, Leitman testified that Vianna had agreed with him, Leitman, as to the guaranty. There is no question but that there is this conflict in Leitman’s testimony. But that does not mean to' say that the testimony as to guaranty should be disregarded in its entirety. Apparently, Leitman’s recollection at the time of pretrial examination was more accurate in this regard than his recollection at the trial. This is borne out, in part, by the *41 cable of March 8, 1952, which Vianna sent to the defendant and which I quoted above, but which bears repetition at this point: “ Don’t worry I guaranty personally payment all drafts against any deposits not extended Stop Sass working closely with me ”. From this cable it would appear that it actually was Sass who, on behalf of the defendant, negotiated the guarantee by Vianna.
But—notwithstanding that much was made of this issue upon the trial—whether it was Sass or Leitman on behalf of the defendant who procured the guaranty from Vianna is of no moment, if in fact there was such an undertaking on Vianna’s part, and the guaranty is valid and enforcible. I find that it is. The consideration for the promise on Vianna’s part was his anticipated commissions from the defendant on future business that the defendant would transact with Nunez, bolstered by Vianna’s guaranty and interest agreement. (The latter undertaking will be discussed in considering the defendant’s second defense and setoff.)
However, while I find that the guaranty has been established, I do not see where the defendant may ground either a defense or setoff upon it. First, I find that the guaranty was a subsequent promise and not a condition of the basic agreement. And, second, I find that there is no proof of damage. There is no evidence that the drafts—the payment of which was guaranteed by Vianna—were not ultimately paid. In consequence, the first defense is stricken and the first setoff is dismissed.
Now, let me consider the second affirmative defense and setoff, to the effect that Vianna 1 ‘ agreed to pay defendant interest at the rate of six (6%) percent per annum for delays in defendant receiving payment in dollars for the purchase price of said tires and tubes which should exceed sixty (60) days from the date of presentation at Porto Alegre, Brazil, of sight drafts for the payment of such purchase price ”.
On April 17, 1952 a cable signed “ Nunez Vianna ” was sent to the defendant, reading as follows: “ Accept to pay interest 6 percent per year for delays exceeding 60 days from presentation of sight draft to us here ’ ’. This cable is clear on its face and leaves no room for interpretation as to its meaning. Vianna thus agreed to guarantee promptness of personal performance by Nunez, who also signed the cable and whose principal obligation it was. The plaintiff’s claim that his name appeared on the foregoing cable “ purely for the purpose of indicating his role as an interpreter ”, and for no other purpose, does not strike me as a credible exculpatory explanation. Nor do the cables which were exchanged between Sass and Nunez prior to *42 the above-quoted cable of April 17,1952, in any sense prove that Vianna personally did not agree to be responsible for the payment of the 6% interest.
It is plain, too, in the circumstances here, that, when Vianna cabled that he would “accept to pay interest” on certain “ delays ”, the word “ delays ” referred to tardiness in dollar coverage. And there is no doubt that there was such delay. However; ! hold that the breach by Vianna in his failure to pay the 6% interest cannot defeat the plaintiff’s recovery on his claim for commissions, but, were the proof to warrant, might be utilized-to offset it. In other words, the issue, on the facts here, is nót a good defense, but could be a valid setoff. For here, too, while the undertaking contained in this cable is an enforcible promise grounded upon the same valid consideration, I find again that it is a post-contractual agreement and not a contractual condition.
The next question is: How far did Vianna’s obligation to pay interest extend? It is axiomatic in our law that a substantial modification of the original contract releases a nonconsenting guarantor from his obligation (M. H. Metal Prods. Corp. v. April, 251 N. Y. 146). When Vianna signed this cable, he guaranteed prompt personal payment by Nunez. But, when Nunez and the defendant formed joint ventures for the 1,435-tire and 1,435-tube shipment and the 6,000-tire shipment, the defendant provided for the performance by the defendant itself of this phase of the transaction. I cannot logically say that anything but discharge of Vianna’s obligation — as of the dates of the joint ventures—was contemplated by the joint-venture contracts. As the defendant was to finance Nunez in the payment of the sight drafts, the defendant could—if I were to hold that there was no release of Vianna’s obligation—assure to itself a 6% return on its investment merely by delaying the payment to Nunez for an indefinite time. To say, as claimed by the defendant, that Vianna’s obligation to the defendant could be affected by an act solely in the control of the defendant is to make Vianna’s agreement an unreasonable one, and the proof does not • support the claim that this was what the parties intended. As to the earlier period, it appears that the first tire and tube shipment involved there arrived in Brazil on May 10, 1952, when sight drafts were presented for payment, and that the joint-venture agreement was entered into on June 28, 1952 — before the expiration of the 60-day period. And the 6,000-tire shipment arrived in Brazil in September, 1952—more than two months after the joint venture agreement relating to it. I hold, therefore, that Vianna’s obligation to pay interest did *43 not apply to the two joint-venture shipments — one of 1,435 tires and 1,435 tubes, and the other of 6,000 tires — in respect of any period of time.
I must next consider the defendant’s contention that Vianna’s obligation on the basis of this cable applies to the shipment of 565 tires and 211 tubes, made on March 12, 1952. These goods arrived in Brazil on April 1, 1952 when sight drafts were presented for payment in cruzeiros. The cable with respect to the Nunez-Vianna agreement to pay interest was sent on April 17, 1952 — over two weeks thereafter. The cable does not in terms refer to the shipments already made. It was in substance drafted by the defendant, and should be construed against the defendant.Moreover, the burden of proof on this affirmative claim by the defendant is upon it. It appears from the evidence before me that the defendant refused to make any future shipments unless the promise to pay interest because of possible delay was made. I have come to the considered conclusion that Vianna’s obligation to pay interest was intended to apply to such future shipments only.
Moreover, by the defendant’s own admissions it did not ship the tires and tubes in accordance with the instructions given to it by Nunez — thus delaying acceptance and payment. In a letter dated June 9, 1952, addressed to Vianna, the. defendant stated, among other things, that “ [i]t was physically impossible to procure, consolidate and make shipping arrangements, of the order [for 1,435 tires and 1,435 tubes] as you submitted it to us.” And in an earlier letter to Vianna, dated May 27, 1952, the defendant’s representative stated, “I regret very much that it was impossible to carry through with your plan of having so many bills of ladings, a shipment that went forth.”
The result on any count is that the defendant’s second defense and setoff are respectively stricken and dismissed in their entirety. ' . . ;
In its third affirmative defense and setoff the defendant alleges that Vianna represented to it that tires and tubes in Brazil were scarce and in great demand and were selling at high prices, that these representations were relied upon by the defendant and it shipped the merchandise to Brazil to its detriment, and that these statements were false and were known to be false by Vianna when made by him. In support of its contentions the defendant offered in evidence a cable from Vianna to it, dated April 7,1952, which reads in part as follows: ‘1 Have additional orders approximately 1050 tires stop because most customers located upstate cities only around 200 will make deposits before expiration import permit remainder first class big companies *44 stop would you be willing to load all 1050 sight draft resting assured that since our prices are good tires scarce moreover customers are reputable big concerns all drafts will be duly honored ”.
On June 14, 1952, approximately two and a quarter months later, Vianna wrote the defendant that “ [t]he situation of the w. w. tires 4 or 5 months ago was much different, and such tires could be sold at a high premium, but since 2 or 3 months ago, it all changed.” The defendant argues that this was an admission by Vianna that he falsely represented the condition of the tire market in his cable of April 7, 1952. I do not agree. This is, and there was, no proof of falsity. And, moreover, I do not find that the defendant acted reasonably in relying (if it did) on Vianna’s representation. On February 27, 1952, just a month and a half before Vienna’s cable, one of the defendant’s officials cabled the defendant from Brazil, saying, among other things, “Market weaker than 2 months ago.” That intelligence should have alerted the defendant to the recognition that, since the beginning of the year 1952, the market for tires and tubes was softening. There is no justification for the defendant’s assertion, in its letter of May 27, 1952, to Vianna that ‘ ‘ [w] e were led to believe at that time that all of the tires were actually sold and that there would be no problem in lifting the drafts and making payment for them in Cruzerias as they were supposed to be.” The defendant’s further assertion, in the same letter from it to Vianna, that it shipped the tires ‘‘ in good faith that the drafts would be lifted immediately after their arrival ”, may be true, but it did not rely, in doing so, upon the afore-quoted cable from Vianna.
When Vianna asked the defendant if it would be “ willing to load all 1050 sight draft resting assured that since our prices are good tires scarce moreover customers are reputable big concerns all drafts will be duly honored ”, that was not a representation of an existing fact, knowingly false when made, but rather a combination of hopeful puffing and optimistic expectation. The evidence, taken as a whole, both oral and documentary, falls far short of sustaining the defendant’s claim that the representations of Vianna were false or were known by him to have been false or were relied upon by the defendant. Nor can the cable (I add parenthetically) be tortured into an undertaking on Vianna’s part that he would himself honor the drafts or guarantee that they would be. Accordingly, the defendant must fail with respect to its third affirmative defense and setoff.
In conclusion, I find Vianna entitled to 5% commission on the true f. o. b. prices on all sales made by the defendant to Nunez *45 either individually or as a joint venturer, ■with interest from the dates that respective dollar coverages were made. To be precise, I refer to the following:
(1) 565 tires and 211 tubes shipped on March 12, 1952, with the f. o. b. prices thereon being $52,744.89, and with dollar coverage being had in respect of $19,215.49 on December 29, 1953, and of $33,529.40 on April 21, 1954. The commission of 5% thereon amounts to $960.77 as of December 29,1953, and the additional sum of $1,676.47 as of April 21,1954.
(2) 1,435 tires and 1,435 tubes shipped on April 17,1952, with the f. o. b. prices thereon being $89,399.35, and with dollar coverage being had on September 30, 1953. The commission of 5% amounts to $4,469.97, of which the plaintiff is entitled to one half or $2,234.99.
(3) 6,000 tires shipped in August, 1952, with the f. o. b. price thereon being $489,777.85, and with dollar coverage being had in June, 1954. The commission of 5% amounts to $24,488.89, of which the plaintiff is entitled to one half or $12,244.45.
The total of this amount is $17,116.68. From this the defendant is entitled to credit for $864.42, already paid to Vianna. The result is that the plaintiff is entitled to judgment in the net sum of $16,252.26, with interest appropriately computed.
Settle judgment on notice in accordance with this decision. Each respective party shall have appropriate exception to each motion which has been determined adversely to that party. The exhibits, which are with the Clerk of the court, may be obtained by respective counsel upon due receipt therefor. Thirty days’ stay and 60 days to make a case.

 “ Dear Mr. Martocci: —
“ This will confirm our oral agreement with respect to any sales of syrup by us to P. Lorillard Company.
“We will pay you a commission of Five Percent (5%) on all sales made to this company and paid for by them. This Five Percent will be figured on our F.O.B. platform price, exclusive of any deposit which may be made for a container.
Very truly yours,
The Greater New York Brewery, Inc.
By: Lowell M. Birbell, President”